540 So.2d 651 (1988)
Ralph E. SAUNDERS, et al.
v.
FLORENCE ENAMELING COMPANY, INC., and Ceramic Coating Company.
87-313.
Supreme Court of Alabama.
August 26, 1988.
Rehearing Denied March 24, 1989.
*652 Frank B. Potts of Potts & Young, Florence, for appellants.
James S. Ward of Corley, Moncus & Bynum, Birmingham, and Gary P. Wilkinson of Poellnitz, Cox & Jones, Florence, for appellees.
MADDOX, Justice.
This is a trade secret case. The plaintiffs sought permanent injunctive relief against the defendants to stop them from using a process for producing enamel-coated pipe. The plaintiffs, Ceramic Coating Company and its subsidiary, Florence Enameling Company, Inc., contended that the defendantsRalph Saunders, individually and d/b/a Saunders Manufacturing Company; Saunders Manufacturing Company; and Donald E. Cromerwere using a certain process for producing the pipe that was the plaintiffs' trade secret. Saunders and Cromer were both former employees of the plaintiffs. (Cromer did not answer the complaint, nor did he appear in the action, and he is not a party to this appeal.) After lengthy pre-trial proceedings, the Circuit Court of Lauderdale County received ore tenus testimony and granted the injunction, but on the defendants' motion it stayed the injunction pending this appeal.
The parties sharply disagree on what the facts of the case actually are, and this has been true from the beginning. The following facts provide a framework for understanding the case. The plaintiffs are involved in coating steel pipes with ceramic or enamel for use in the aluminum industry. Ceramic or enamel is applied to the pipes and they are then cured in a furnace. These pipes are called "fluxing pipes." Apparently, it is very important in this industry that the coatings not have any blemishes in them. These blemishes are commonly called "chinks" or "point marks." Apparently, any such marks make the pipe less durable in those spots where the chinks are made. The plaintiffs used a process of firing the coating in a furnace that did not leave any of these chinks or point marks. This process is what is claimed to be a trade secret. Defendant Ralph Saunders was an employee of the plaintiffs for 11 years. He left their employ and opened a factory to produce coated pipe.
The trial judge saw the witnesses, heard the evidence, viewed the exhibits, and specifically found that: 1) Florence Enameling's process of producing the pipe was a unique and novel process and was entitled to protection as a trade secret; 2) defendants Saunders and Cromer obtained their knowledge of the process from working at the Florence Enameling manufacturing plant; 3) the plaintiffs had treated the process as a secret and had never abandoned it; and, 4) the defendants' manufacture and sale of the pipe caused harm of an irreparable nature to Florence Enameling. On the basis of these findings, the trial judge issued a permanent injunction preventing the defendants from using the process.
The defendants here raise three issues. First, they contend that the process used by Florence Enameling was not a trade secret. Second, they argue that even if the process was a trade secret, they did not obtain it by improper means. Third, they argue that no showing of irreparable harm to the plaintiffs was made and that the issuance of the injunction was, therefore, improper. We will consider each of these arguments in turn.

I
Our rule of review of a case tried ore tenus is well settled. Where a trial court hears ore tenus evidence, its findings of fact based upon competent evidence are presumed to be correct and will not be disturbed on appeal if supported by the evidence or by any reasonable inferences therefrom, unless they are plainly and palpably erroneous or manifestly unjust. Drill Parts & Service Co. v. Joy Manufacturing Co., 439 So.2d 43 (Ala.1983) (a case that also involved a question of a trade secret).

II
We first turn to the appellants' contention that the process used by Florence Enameling *653 is not a trade secret. The Alabama Legislature has adopted the Alabama Trade Secrets Act, see Ala.Code 1975, § 8-27-1 et seq.; however, that Act did not become effective until August 12, 1987, over two years after this action was filed. Therefore, this case is controlled by the case of Drill Parts & Service Co. v. Joy Manufacturing Co., 439 So.2d 43 (Ala. 1983). In that case this Court recognized the doctrine of trade secrets and adopted the definition of "trade secret" contained in Restatement of Torts, § 757 (1939):
"In the comments to § 757, there is a general definition of `trade secrets' adopted by many courts which have addressed the issue:
"`A trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.... a trade secret is a process or device for continuous use in the operation of the business. Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.
"`* * *
"`An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.'"
Drill Parts, supra, at 48 (emphasis added).
Evidence heard by the trial judge includes testimony from the inventor of the fluxing process, W.W. Carpenter, that the process was unique; that the process had been developed over a number of years and required extensive tests on both raw materials and on the actual process of applying the coating to the pipe; that the process for coating the pipe without leaving point marks was not available until he invented it; that the process gave the plaintiffs a competitive advantage in the industry because it created a superior pipe, i.e., one without point marks; that the process provided an advantage by saving the time and expense of employing people to remove point marks; that the process produced fluxing pipe that lasted longer, yet was produced more quickly than in other methods; that the method saved a minimum of seven to eight percent per pipe; that the company considered the process to be a secret and that the furnace was at the heart of the process; that a patent on one of the plaintiffs' processes that had expired would not provide the information necessary to construct a similar furnace process; that during a visit by a Japanese salesman, the plaintiffs' employees, including Saunders, were reminded that the process was secret and were told not to let the salesman see the furnace; that other visitors to the plant were not allowed to see the furnace; that salesmen and repairmen were not allowed to see the furnace; that other employees were not allowed to go into the area where the furnace was located; that covers were placed over the gear box and the transport system involved in the process; and, that no cameras were allowed in the plant.
Saunders testified that he got the idea for firing pipe without chinks from the plant in Florence; that he used this process *654 in constructing his furnace; and that he had not read about this particular type of furnace anywhere else.
An employee manual in use while Saunders was employed at the plant was submitted in evidence; it specifically stated that certain plant information was confidential. Plaintiffs adduced evidence that Saunders knew that the furnace was within this class of confidential information and that he helped write and enforce the manual. Saunders testified that he remembered that visitors to the plant were not allowed around the furnace and remembered specifically the case of the Japanese salesman.
A plant foreman from Florence Enameling testified that the company had erected "no trespassing" and "authorized personnel only" signs at its plant site; that newly hired employees were told that the furnace was a secret; that new employees were told not to discuss the details of the furnace with anyone; that there were covers on the gear boxes of the furnace conveyors; and that when repairmen or salesmen came through the plant protective measures were taken so that they would not see the furnace; that when it was necessary to leave the plant doors open, materials were stacked around the doors to keep people on the outside of the plant from seeing the furnace or having access to it; and that the furnace could not be seen from the road outside the plant. He also testified that the company periodically reminded employees of their obligations as they were spelled out in the plant manual.
Based on this evidence, the trial judge specifically held that the process employed by Florence Enameling was a trade secret and was entitled to protection. "What constitutes a trade secret is a question of fact for the trial court." Drill Parts, supra, at 49. In this case, we find sufficient evidence in the record from which the trial judge could have properly found that the process was a trade secret, based on the factors listed in Drill Parts, and we cannot say that his decision was plainly or palpably wrong or manifestly unjust.
The defendants' main argument is that Carpenter invented his process while he was working for another company and paid nothing for the secret when he left that company when that company stopped producing fluxing pipe, and therefore, that the plaintiffs are not entitled to trade secret protection. We do not find any such limitation in the Drill Parts case, and this, without more, is not enough to deprive the plaintiffs of trade secret protection. Based on the law and the evidence, we hold that the trial judge's factual determination that the process was entitled to trade secret protection is due to be affirmed.

III
Second, the defendants contend that there was no proof that they obtained the secret by improper means and that there is, therefore, no liability. Again, we turn to Drill Parts for a discussion of what must be proven to create liability for the misuse of another's trade secret:
"`One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
"`(a) he discovered the secret by improper means, or
"`(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or
"`(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or
"`(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake.'"
Drill Parts, at 48, quoting Restatement of Torts, § 757 (1939).
The trial judge held that there was evidence that the plaintiffs had taken steps to protect their trade secret, that the employees knew of an intention to keep the process secret, and that the defendants learned of the process from their work at the plant. There was evidence adduced at *655 trial that Saunders had worked for the Florence Enameling; that he had learned of the enameling process while in its employ; that he was told that the process was secret and knew that the employee manual prevented the revelation of this secret; that he had in the past, on specific occasions, kept others from viewing the furnace process because it was a secret; that he had helped draft the handbook and was familiar with the section on secrecy; and that he admitted that he got the idea for firing fluxing pipe without point marks when he saw the process used at Florence Enameling. The inventor of the process, Carpenter, testified that he had seen the defendants' furnace and that it used exactly the same process he had invented. In addition, photographic evidence of both the plaintiffs' and the defendants' furnace process was submitted in evidence. Under these facts, we hold that the trial judge could have properly determined that the use of the trade secret by the defendants constituted a breach of confidence reposed in Saunders and Cromer by their former employer. Drill Parts, supra. The trial judge's determination, therefore, was not plainly or palpably wrong or manifestly unjust. His judgment is, therefore, due to be affirmed on this ground.

IV
Third, the defendants argue that there was no proof of any irreparable damage to the plaintiffs in this case and that the trial court, therefore, erred in granting a permanent injunction. The defendants conclude that, on the evidence presented, the so-called comparative injury doctrine prevented the trial judge from granting the injunction. Citing Daniels v. Chapuis, 344 So.2d 500 (Ala.1977), they argue that the trial court was required to weigh the comparative injury to the parties and to the general public because of the grant or denial of the injunction and that the evidence showed that the injury to the plaintiffs in this case would be small compared to the injury to the defendants and the general public.
"It is established Alabama law that, in determining whether an injunction should issue, wide discretion is accorded the trial judge hearing the application and making the decision....
"* * *
"The `comparative injury doctrine' has been generally recognized in American jurisprudence and is but a species of the balancing of the equities principle. Thus, we adopt this doctrine for application in appropriate cases as it is set forth in 42 Am.Jur.2d, Injunctions, § 56, pp. 798, 799. (See also Restatement, Torts, § 941):
"`Injunctions are never granted when they are against good conscience, or productive of hardship, oppression, injustice, or public or private mischief, and it may be said to be the duty of the court whose jurisdiction is invoked to secure injunctive relief, when considering the application, to consider and weigh the relative convenience and inconvenience and the comparative injuries to the parties and to the public which would result from the granting or refusal of the injunction sought.'"
Daniels v. Chapuis, 344 So.2d 500, 503 (Ala.1977).
Although we agree with the defendants that the trial judge could have properly applied the "comparative injury doctrine" in this case, we are not persuaded that he did not do so or that his order is an abuse of his discretion. To the contrary, the trial judge's order is carefully tailored to prevent only the defendants' use of the particular process in question.[1] The order does not force the defendants to stop production, nor does it close their business. It enjoins only their production of one particular productfluxing pipeby one particular method. Based on our reading of the record, we hold that the trial judge did not abuse his discretion by issuing the permanent injunction. His judgment is, therefore, due to be affirmed.
AFFIRMED.
TORBERT, C.J., and ALMON, BEATTY and HOUSTON, JJ., concur.

*656 ON APPLICATION FOR REHEARING
MADDOX, Justice.
On application for rehearing, appellants raise several issues.

I
We set out the first one verbatim from their brief:
"First, and foremost, this is not a case where the ore tenus standard of review applies. Hundreds of pages of testimony were submitted from depositions taken outside the hearing of the trial court. As such, no presumption of correctness [of] factual determinations drawn from such testimony should apply."
In view of counsel's earnest insistence that this Court applied an improper standard of review, we have reexamined the record filed by the appellants. Our application of the ore tenus standard was based upon the fact that the trial judge, in his order of submission, stated the following:
"This cause coming on to be heard on plaintiffs' complaint for permanent injunctive relief against defendants (all other aspects of plaintiffs' complaint and defendants' countercomplaint having been either dismissed or severed) and the Court receiving testimony ore tenus and numerous exhibits into evidence, the Court finds as follows:" (Emphasis added.)
Appellants' reference to "[h]undreds of pages of testimony ... submitted from depositions taken outside the hearing of the trial court" must refer to the testimony of William Dykstra, James W. Elliott, Larry M. Williams, Donald Cromer, and Richard Tishey. It appears that portions of these depositions were read into evidence by counsel for appellants at appellants' request. The record shows:
"MR. POTTS: Your Honor, I think we would like, at this time, to read some of the depositions into evidence."
In any event, the rule of law is that a judgment rendered upon evidence taken by deposition and orally before the trial court will not be disturbed on appeal unless plainly wrong. In Kendall v. Kendall, 268 Ala. 383, 106 So.2d 653 (1958), this Court, citing cases, stated the rule:
"The evidence was taken by deposition and orally before the trial court. The depositions concerned the contents of the hospital records and the testimony of the two psychiatrists in Washington. A judgment or decree rendered under such conditions will not be disturbed by this court unless plainly wrong. American Ry. Express Co. v. Mobile Importing & Trading Co., 214 Ala. 420, 108 So. 238 [(1926) ]; Gardiner v. Willis, 258 Ala. 647, 64 So.2d 609 [(1953)]."

II
Next, Appellants complain that this Court found that the Alabama Trade Secrets Act did not apply, but that we did not address whether the Act should have prospective application "in the enforcement of the Court's order." Appellants ask: "What happens when the law changes and use of the process is no longer a trade secret according to the definition contained in the Alabama Trade Secrets Act?"
In their rehearing brief, appellants argue:
"Defendants/Appellants anticipate immediate motions to be filed with the trial court requesting permission to inspect Ralph Saunders' plant, motions for contempt for alleged noncompliance, etc., following this Court's ruling on the Application for Rehearing. Unless some guidance and direction is given to the parties in this regard, an additional appeal may be necessitated to ascertain the applicable standard for future enforcement of the injunction should it remain affirmed by this Court."
We decline to speculate on the future course of this proceeding or to state our opinion on any legal issue not presented by the record on appeal.

III
Appellants further contend that the opinion contained at least one factual inaccuracy,[2] *657 and appellants argue again the principles argued on original deliverance.
We have extended the opinion to answer arguments raised on rehearing, but we are of the opinion that appellants have presented nothing that warrants our changing the judgment originally entered.
OPINION EXTENDED; APPLICATION DENIED.
HORNSBY, C.J., and ALMON, SHORES, and HOUSTON, JJ., concur.
ADAMS and STEAGALL, JJ., dissent.
NOTES
[1] We do not set out the trial judge's order, because to do so would result in the revelation of much of the information this litigation seeks to protect.
[2] The Court's original opinion states that W.W. Carpenter was "the inventor of the fluxing process." Footnote 1 of plaintiffs' original brief defines the fluxing process and this definition was uncontroverted by appellees. The evidence did not indicate that Mr. Carpenter invented the fluxing process, only that he devised, while working for another company over 30 years ago, one method of firing porcelain-enameled pipe that was used for fluxing purposes. Stated differently, Mr. Carpenter developed a simple firing process for the purpose of producing one of several types of pipe that could be used in the fluxing process of molten aluminum.